UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Daniel Cribbins,

    Plaintiff,

v.

Scott Preston and
Birch Run School District,

    Defendants.
_____/

Case No. 19-cv-12769

Honorable Nancy G. Edmunds

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [28]
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [30]**

Plaintiff Daniel Cribbins alleges in his complaint that his minor child, A.C., was not afforded procedural due process when he was suspended from school for three days by Defendants Birch Run School District and Principal Scott Preston for using a racial epithet against another student. Pending before the Court are the parties' cross motions for summary judgment. (ECF No. 28, 30.) Each motion is opposed and fully briefed. (*See* ECF No. 32-35). Pursuant to L.R. 7.1(f), the Court declines to hold oral argument. For the reasons below, the Court GRANTS Defendants' motion and DENIES Plaintiff's motion.

**I.   Background**

In 2018-2019, A.C. was a fifth grade student at Marshall Greene Middle School in Birch Run, Michigan. (ECF No. 30-2, PageID.328.) Scott Preston was the principal of Marshall Green and had worked as assistant principal, and then principal of the school, since October 23, 2000. (*Id.*)

1

On Friday November 9, 2018, during dismissal, Mr. Preston spoke with the mother of another student, A.J. (*Id.* at PageID.329.) A.J.'s mother informed Mr. Preston that another student had called A.J. the "N word" at school earlier that week. (*Id.* at PageID.329.) This type of language violates the behavior expectations outlined in the school's student handbook, therefore Mr. Preston was required to "promptly investigate" the allegation and take an "appropriate remedial action" if it was determined that the complained of incident had occurred. (*Id.* at PageID.396.)

Mr. Preston understood from A.J.'s mother that the incident had occurred near the students' lockers by a boy with a locker next to A.J.'s. (*Id.*) On the following Monday, Mr. Preston determined that A.C. had a locker next to A.J.'s so he called A.C. into his office to discuss the incident. (*Id.* at PageID.328-29.)

Once A.C. arrived at the office, Mr. Preston proceeded to question him about the allegation that he had used a racial epithet. (*Id.* at PageID.329.) The parties disagree over the form of the question Mr. Preston used to gather facts about the incident. Defendants state that Mr. Preston informed A.C. of the allegation from A.J.'s mother and asked A.C. if he had ever used the N word "at school." (*Id.*) A.C. recalls Mr. Preston asking him whether he called A.J. the N word "while she was putting her stuff away in her locker." (ECF No. 28-3, PageID.260.) Regardless, A.C. denied having ever used the word either at school or otherwise. (*Id.*; ECF No. 30-2, PageID.329.) A.C. identified another student that could substantiate his side of the story and suggested that student may have been the one who used the racial epithet towards A.J. (*Id.*)

Mr. Preston did not believe A.C. Drawing on his years of experience in education and as someone who had investigated and disciplined children, Mr. Preston concluded

2

A.C. was not telling the truth based upon his body language including A.C.'s "nervousness, lack of eye contact, [and] stuttering." (ECF No. 30-2, PageID.329.)

But the investigation continued, and Mr. Preston spoke to I.S., the student A.C. had identified as a witness or possible guilty party. I.S. stated he did not recall hearing A.C. use the racial epithet near the lockers but reported that A.C. had called him the N word twice before, in the hallway and in the bathroom. (*Id.* at PageID.330.) I.S. further identified another student, E.M., who witnessed these incidents.[1] (*Id.*) When Mr. Preston questioned E.M., he indicated that he did not recall anything happening in the hallway, but that he heard A.C. called I.S. the N word in the bathroom. (*Id.*) E.M. could not identify any other students who might have witnessed these occurrences. (*Id.*)

As there were no more students identified, Mr. Preston concluded his investigation and A.C. was suspended for using racial slurs at school, towards A.J. and towards I.S. (ECF No. 30-2, PageID.343.) Mr. Preston then phoned A.C.'s parents. (*Id.* at PageID.331.) A.C. remembers returning to the school office where he was informed of his suspension. (ECF No. 28-3, PageID.265.) Mr. Preston does not recall the specifics of that second conversation. (ECF No. 30-2, PageID.330.) School records indicate that A.C. began serving his suspension the following day, November 13, and returned to school on Friday, November 16. (ECF No. 30-2, PageID.422.)

After receiving the message from Mr. Preston regarding their son's suspension, A.C.'s parents contacted Mr. Preston claiming their son was innocent and asking that the

---

[1] Mr. Preston initially testified that I.S. identified a different student, L.M. (ECF No. 30-2, PageID.330). Mr. Preston's notes from his investigation, however, indicate the student he spoke with following I.S was E.M., not L.M. (*Id.* at PageID.338.) Mr. Preston subsequently confirmed during his deposition that his prior testimony was mistaken and that I.S. identified, and Mr. Preston subsequently spoke to, E.M. on November 12, 2018, not L.M. (*Id.*)

3

incident be looked into further. (*Id.* at PageID.331.) Mr. Cribbins and Mr. Preston met in person several times over the next few days as Mr. Cribbins insisted that his son had never used the N word and would never lie to him. (*Id.*) Because A.C.'s parents were so adamant that their son would never use a racial epithet, Mr. Preston decided to speak with A.J. whom he had previously decided not to interview.[2] (ECF No. 30-2, PageID.332.)

On Wednesday, November 14, the second day of A.C.'s suspension, Mr. Preston met with A.J. who informed him that the incident had not occurred near the lockers but that it had happened in the cafeteria on November 6th. (ECF No. 30-2, PageID.332.) She was not sure why her mother had reported that the incident occurred at the lockers. (*Id.*)

Mr. Preston reviewed the security camera footage from the cafeteria with A.J. and the school's superintendent David Bush (*Id.*) A.J. was able to identify the time and place the incident occurred and directed them to that portion of the video. (ECF No. 28-5, PageID.285.) According to Mr. Preston, the video was of excellent quality and he clearly saw A.C. leave his seat, get in front of A.J., turn to her so as to "taunt her," then run to pass her up in the line. (ECF No. 30-2, PageID.332.) A.J. indicated that that is when the incident took place. (ECF No. 28-5, PageID.285.) There was no audio, but Mr. Preston could see A.C.'s lips moving. (ECF No. 30-2, PageID.333.) Mr. Bush agreed with Mr. Preston that the video corroborated A.J.'s story that A.C. had called her the N word at school. (*Id.*) Mr. Preston then called Mr. Cribbins to let him know there was a video of the incident. (*Id.* at PageID.334.)

Mr. Cribbins returned to the school and reviewed the security camera footage with Mr. Preston. (*Id.*) According to Mr. Cribbins, the video was of low quality and A.C. was

---

[2] Mr. Preston initially felt an interview with A.J. was unnecessary since he already had the information he needed and because her mother stated the incident was upsetting to A.J. (ECF No. 30-2, PageID.329.)

4

facing away from the camera so he was unable to conclude if A.C. spoke to A.J. (ECF No. 28-4, PageID.275.)³

Mr. Cribbins, still believing A.C. had been wrongfully suspended, continued to try to reverse A.C.'s suspension by contacting Mr. Bush and then hand delivering a letter to the local school board on November 19th. (*Id.*; ECF No. 28-5, PageID.286; ECF No. 1, PageID.5.) The letter outlined Mr. Cribbins' concerns regarding the decision to suspend his son despite the evidence "having changed so drastically." (ECF No. 30-2, PageID.453.) Mr. Cribbins relayed to the school board that he had an issue with Mr. Preston not reversing the suspension since evidence acquired after the suspension made clear that A.C. did not use a racial epithet at the lockers or on the date initially suspected. (*Id.*) After Mr. Cribbins sent an additional email to the school board on February 4, the school board sent him a letter stating that it reviewed Mr. Cribbins' letter and the incident and determined the incident was adequately investigated and the appropriate consequence was applied. (ECF No. 30-2, PageID.455.)

On September 23, 2019, Mr. Cribbins filed this action in which he seeks costs, compensatory and punitive damages, and to have the suspension removed from A.C.'s record. (ECF No. 1.) The sole surviving claim after resolving Defendants' motion to dismiss (ECF No. 6) alleges that Defendants violated A.C.'s right to procedural due process.

---

³ The video evidence of the incident in the cafeteria has since been overwritten in the normal course of business for the school. Plaintiff asks the Court for an adverse inference instruction due to Defendants' failure to preserve the video. (ECF No. 32, PageID.704.) The Court denies Plaintiff's request because whether or not A.C. actually used the racial epithet at school is not the issue here. Rather, the Court must determine whether A.C. was given constitutionally adequate due process. It is sufficient for this Court that Mr. Cribbins was able to view the video and that each party interpreted that evidence differently.

## II. Legal Standard

The fact that the parties have filed cross motions does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander*, 576

6

F.3d at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). Once that occurs, the party opposing the motion must support its position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

Showing there is "some metaphysical doubt as to the material facts" is not enough. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There must be sufficient evidence upon which a fair-minded jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet its burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.     Analysis**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1; *Jahn v. Farnsworth*, 617 F. App'x 453, 459 (6th Cir. 2015). "Procedural due process requires that a person be afforded notice and a right to be heard before the state deprives him of a property or liberty interest." *Jahn*, 617 F. App'x at 459 (citing *Warren v. City of Athens,* 411 F.3d 697, 708 (6th Cir.2005)). To determine whether a person's due process rights have been violated, "a court must first determine whether the party has identified a protected liberty or property interest, and then turn to whether the deprivation of that interest contravened notions of due process." *Id.* (citing *Hamilton v. Myers,* 281 F.3d 520, 529 (6th Cir.2002)).

7

The United States Supreme Court has recognized a student's right to limited procedural due process when confronted with a potential suspension of ten days or less. *Goss v. Lopez,* 419 U.S. 565 (1975). At a minimum, a student facing a short-term suspension from school "must be given *some* kind of notice and afforded *some* kind of hearing." *Id.* at 579 (emphasis in the original). The notice may be informal, and the hearing may occur in the same setting and directly after notice is given—the student must simply be told what he is accused of doing and the basis for the accusation. *Id.* at 582. If the student denies the charges, school authorities are "required to explain the evidence in their possession and give [the student] an opportunity to present his version of the facts." *Jahn*, 617 F. App'x at 459. "Once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands." *Buchanan v. City of Bolivar,* 99 F.3d 1352, 1359 (6th Cir.1996) (quoting *C.B. v. Driscoll,* 82 F.3d 383, 386 (11th Cir.1996)).

Under this standard, A.C. received all the due process to which he was entitled. Plaintiff argues A.C. was not provided notice nor an explanation of the evidence against him because he was questioned about and suspended for using a racial slur "at the lockers" before subsequent investigation revealed the language was used in the restroom and in the lunchroom. But Mr. Preston clarified at his deposition that A.C. was suspended for using the language "at school" not for specifically using the language "at the lockers." (ECF No. 30-2, PageID.343.) Moreover, A.C. was given notice and an opportunity to present his version of the facts when meeting with Mr. Preston in his office on November 12th. At that time, Mr. Preston relayed the basis of the accusation to A.C. and allowed

8

him to give a brief response. Under *Buchanan*, this was all that was required of school administrators. *See Buchanan,* 99 F.3d at 1359 (6th Cir.1996).

The fact that subsequent investigation revealed additional evidence does not change this; nor does the suggestion that the incident involving A.C. and A.J. occurred on another day and at another location within the school. A.C. was given "*some* kind of notice and afforded *some* kind of hearing," all that due process requires. *Goss v. Lopez,* 419 U.S. 565 (1975) The Court is satisfied that the suspension was based on A.J.'s parent's accusation and Mr. Preston's interpretation of A.C.'s response, two pieces of evidence that A.C. was made aware of during his initial interview in Mr. Preston's office. (*See* ECF No. 28-3, PageID.265.) The additional evidence, reviewed by Plaintiff on A.C.'s behalf, supported the earlier decision made by Mr. Preston. School administration authorities later confirmed that suspending A.C. was the proper response and it is not for this Court to say otherwise. *See Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("[i]t is not the role of the federal courts to set aside decisions of school administrators . . .").

Plaintiff argues that Mr. Preston was a biased decision-maker because he concluded A.C. was guilty without any evidence, refused to speak to A.J. until after the suspension, and did not interview all the potential witnesses identified by Plaintiff and A.C., but this argument fails on several fronts. *See* ECF No. 32, Page ID.698; *Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 567 (6th Cir. 2011) ("[t]o be fundamentally fair and comport with the requirement of due process, the opportunity for a hearing prior to a suspension must occur in front of an unbiased decision-maker). First, Plaintiff has provided no evidence of bias. Mr. Preston had a specific accusation against A.C. which he determined to be true based upon his many years of experience as a school

disciplinarian and the body language A.C. displayed during his initial interview. Additionally, Mr. Preston states he determined interviewing A.J. would not be in her best interest as he already had the allegation from her mother and did not wish to upset A.J. further by requiring her to recall the incident. Finally, Plaintiff has provided no authority to suggest that a school administrator is required to conduct the extensive investigation that Plaintiff alludes is appropriate. This argument is also undermined by *Goss* and *Buchanan* which require little more than a conversation with a student accused of wrongdoing.

Plaintiff proceeds to argue that, under *Strickland v. Inlow*, 519 F.2d 744 (8th Cir. 1975), Defendants were required to notify A.C. of the "second charge" of using a racial epithet in the bathroom and in the lunchroom after he was only accused of using the slur near the lockers. *Strickland*, however, can be distinguished. In that case, the plaintiffs and a third high school student were suspended from school after they admitted to spiking the punch at a school function. 519 F.2d at 745. The school principal informed the students that his decision to suspend them was subject to ultimate disposition by the school board, but notice of the time and place of the school board meeting was not provided. *Id.* When the board meeting was held, the members voted to suspend the students for the balance of the semester, but this decision was based at least in part on an allegation from a teacher that the third student was recently involved in an altercation at a basketball game. *Id.* at 746. On these facts, the Eighth Circuit Court of Appeals found the failure to inform the plaintiff high school students of the time and place of the board meeting was violative of their right to procedural due process. *Id.* Additionally, the court found that any opportunity the plaintiffs had to present their side of the case was rendered meaningless

10

as they were not given notice of the second charge involving the basketball game altercation. *Id.*

Unlike in *Strickland*, where spiking punch and getting into a physical altercation at another place and time are fundamentally different charges, the charge that A.C. used the racial epithet in the lunchroom or in the bathroom was fundamentally the same as the charge that he used the same slur near the lockers. The issue was whether A.C. used the language *at school* and A.C. would have known that using derogatory language anywhere on school property violated the behavior expectations laid out in the school's Student Handbook. (*See* ECF No. 30-2, PageID.396.)

Moreover, Plaintiff cannot show A.C. was prejudiced by the process that occurred. "In order to prevail on a procedural due process challenge, Plaintiff must not just show faulty procedure; he must also show prejudice." *Jahn*, 33 F. Supp. 3d at 873 (citing *Graham v. Mukasey*, 519 F.3d, 549 (6th Cir. 2008). "[T]o establish prejudice, Plaintiff 'must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of these violations.' " *Id.* Subsequent evidence obtained even after A.C. began serving his suspension only served to support the allegation that A.C. used a racial epithet at school towards another student. Thus, Plaintiff cannot show that A.C. was prejudiced when school authorities refused to reverse A.C.'s suspension after learning that the incident complained of had not occurred at the lockers, as originally suspected.

### IV. Conclusion

For the reasons stated above, the Court finds there was no due process violation. The main factual basis of the suspension never changed and A.C. was given both notice

and an opportunity to present his version of the facts. Had a different procedure been employed wherein all the evidence against A.C. was gathered and presented to him at a later date, the outcome would have been the same. Plaintiff disputed the value of the evidence uncovered during subsequent investigation, but this did not change the ultimate determination by school administrators that a short-term suspension was appropriate.

Accordingly, Plaintiff's motion for summary judgment is **DENIED** (ECF No. 30) and Defendants' motion for summary judgment is **GRANTED** (ECF No. 28).

**SO ORDERED.**

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 20, 2021

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 20, 2021, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager